AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | FILED |
| --- | --- |
| | CLERK, U.S. DISTRICT COURT |
| | 3/2/2021 |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY: _____ DL _____ DEPUTY |

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the* )
*person by name and address)* )
)     Case No.  2:21-mj-01009
)
The premises of 1039 South Hobart Boulevard Unit )
214, Los Angeles, CA 90006, as more fully )
described on Attachment A-1 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1029 | Fraud in Connection with Access Devices |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1956 | Money Laundering |
| 18 U.S.C. § 286 | Conspiracy to Defraud the Government with Respect to Claims |
| 18 U.S.C. § 287 | False, Fictitious or Fraudulent Claims |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm and Ammunition |
| 18 U.S.C. § 924(c) | Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| 21 U.S.C. § 841 | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 843(b) | Use of a Communication Facility to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Anthony Clark*

_____
*Applicant's signature*

Anthony Clark, Special Agent, DOL-OIG
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _03/02/2021_____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Andrew M. Roach (x0306)

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The property to be searched is 1039 South Hobart Boulevard Unit 214, Los Angeles, CA 90006 ("SUBJECT PREMISES 1"), which is an apartment within a multi-family residential building, as pictured below.  The property sits between 11th Street to the south, Olympic Boulevard to the north, and Serrano Avenue to the west.  The numbers "1039" are written in gold on the face of the building between two entry doors.  There are two gated vehicle entries, one of which is at grade and the other subterranean. The property is white and gray with orange window accents. There are six balconies on the face of the building.  The specific unit to be searched, Unit 214, is located on the second floor.  Unit 214 is a one bedroom, one bathroom apartment, with a loft, and area of 670 square feet.



**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1028 (Fraud in Connection with Identification Documents), 1028A (Aggravated Identity Theft), 1029 (Fraud in Connection with Access Devices), 371 (Conspiracy), 1956 (Money Laundering), 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False, Fictitious or Fraudulent Claims); 641 (Theft of Government Property), 1341 (Frauds and Swindles), 1343 (Wire Fraud), 922(g) (Felon in Possession of a Firearm and Ammunition), and 924(c) (Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime); Title 21, United States Code, Sections 846 (Conspiracy To Distribute Controlled Substances), 841 (Possession with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communication Facility to Distribute Controlled Substances) (the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Firearms and ammunition;

d.    Items used in the packaging of currency for
consolidation and transportation, such as money-counting
machines, money wrappers, carbon paper, rubber bands, duct tape
or wrapping tape, plastic wrap or shrink wrap, and plastic
sealing machines;

e.    United States currency over $1,000 or bearer
instruments worth over $1,000 (including cashier's checks,
traveler's checks, certificates of deposit, stock certificates,
and bonds) (including the first $1,000), and data, records,
documents, or information (including electronic mail, messages
over applications and social media, and photographs) pertaining
to, obtaining, possessing, using, applications for, or
transferring money over $1,000, such as bank account records,
cryptocurrency records and accounts;

f.    Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators, sources of supply of
controlled substances, or drug customers, including calendars,
address books, telephone or other contact lists, pay/owe
records, distribution or customer lists, correspondence,
receipts, records, and documents noting price, quantities,
and/or times when drugs were bought, sold, or otherwise
distributed, whether contained in hard copy correspondence,
notes, emails, text messages, photographs, videos (including
items stored on digital devices), or otherwise;

g.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to

show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

      h.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

      i.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

      j.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs, firearms, or
ammunition;

      k.   Contents of any calendar or date book;

      l.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations;

      m.   Records, documents, correspondence, faxes, and e-
mails sent to and received from any State Workforce Agency or
the IRS, including the California Employment Development

Department, including any applications for Unemployment
Insurance or tax return.

n.   Records and documents containing information,
including Personally Identifiable Information, e.g., names,
Social Security Numbers, dates of birth, addresses, phone
numbers, and driver's license numbers, to be used in support of
any application for Unemployment Insurance, any claim of
continuing eligibility for Unemployment Insurance and/or any tax
return, or any claim for an Economic Impact Payment ("EIP");

o.   Checks, EBP cards, tax refunds, or any other
payments received from any State Workforce Agency, including the
California Employment Development Department, or the IRS;

p.   Payroll and personnel records, receipts, IRS
Forms W-2, IRS Forms W-4, IRS Forms 1099, and State and Federal
Tax Returns;

q.   Copies of and actual driver licenses, state
identification cards, passports, and other forms of
identification.

r.   Indicia of occupancy, residency, control, and/or
ownership of SUBJECT PREMISES, including utility bills,
telephone bills, loan payment receipts, rent documents, keys,
photographs, and bank records.

s.   Bank records or records received from financial
institutions, including debit cards; correspondence regarding
debit card accounts; wire transfer records; bank statements and
associated transactional records; money drafts, letters of
credit; safety deposit box keys and records; checkbooks; money

wrappers; money containers; income tax records; payroll records; credit cards; and any other records of financial transactions that reflect the disposition and/or allocation of monies.

       t.   Cash or cash equivalents, such as pre-paid cards in excess of $500;

       u.   A model year 2020 Dodge Ram Rebel with a vehicle identification number ("VIN") of 1C6SRFLM0LN332115 and bearing California license plate 23741Z2;

       v.   A model year 2016 Land Rover with a VIN of SALWR2EF8GA562847 and bearing temporary Texas license plate 68762P9;

       w.   A model year 2018 Aprilia motorcycle with a VIN of ZD4KEU006JS001083 and bearing California license plate 24G5202;

       x.   A model year 2017 Aprilia motorcycle with a VIN of ZD4KEU004HS000167 and bearing California license plate 23P0670;

       y.   A model year 2019 Harley Davidson motorcycle with a VIN of 1HD4LE235KC434072 and bearing California license plate H47580;

       z.   Records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money;

       aa. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

bb.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  Evidence of the presence of absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. Evidence of the attachment of other devices;

iv.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.  Evidence of the times the device was used;

vi.  Passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access or to conduct a forensic examination of it;

    viii.  Records of or information about Internet Protocol addresses used by the device;

     ix. Records of or information about the device's internet activity, including firewall logs, cashes, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

   cc. As used herein, the terms "records", "documents", "programs", "applications", and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

   dd. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebooks, and tabled computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony Playstation and Microsoft Xbox); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

2.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

5.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress EDWARD KIM's or PALOMA
FOSTER's thumb and/or fingers onto the fingerprint sensor of the
device (only when the device has such a sensor), and direct
which specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of EDWARD KIM's or PALOMA FOSTER's
face with his or her eyes open to activate the facial-, iris-,
or retina-recognition feature, in order to gain access to the
contents of any such device.  In depressing a person's thumb or
finger onto a device and in holding a device in front of a

person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Anthony Clark, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a complaint and arrest warrant for Edward Kim ("KIM") for a violation of 21 U.S.C. § 841(b)(1)(B)(viii): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for a warrant to search the following premises (collectively, the "SUBJECT PREMISES"):

a.   The premises of 1039 South Hobart Boulevard Unit 214, Los Angeles, CA 90006 ("SUBJECT PREMISES 1"), one of KIM's apartments, as more fully described on Attachment A-1;

b.   The backroom or any other areas under PALOMA FOSTER's control, whether attached or unattached, at the property located at 113 South Grandview Avenue, Covina, CA 91723 ("SUBJECT PREMISES 2"), which is a residence rented by KIM's girlfriend/partner and co-conspirator, PALOMA FOSTER ("FOSTER"), and where KIM is also known to frequent, as more fully described on Attachment A-2;

c.   The premises of 1301 South Beach Boulevard, Suite E, La Habra, CA 90631 ("SUBJECT PREMISES 3"), a commercial space that KIM is currently renting, as more fully described on Attachment A-3; and

d.   The premises of 1200 South Figueroa Street, Unit W3124, Los Angeles, CA 90015 ("SUBJECT PREMISES 4"), a luxury

apartment that KIM has been renting since July 2020, as more fully described on Attachment A-4.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code §§ 1028A (Aggravated Identity Theft), 1029 (Fraud in Connection with Access Devices), 371 (Conspiracy), 1956 (Money Laundering), 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False, Fictitious or Fraudulent Claims), 1341 (Mail Fraud), 1343 (Wire Fraud), 922(g) (Felon in Possession of a Firearm and Ammunition), and 924(c) (Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime); and Title 21, United States Code, §§ 846 (Conspiracy to Distribute Controlled Substances), 841 (Possession with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communication Facility to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and A-4, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

2

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am Special Agent with U.S. Department of Labor Office of Inspector General ("DOL-OIG"), currently assigned to the Las Vegas Field Office.  I have been employed with DOL-OIG since January 2019.  I am a graduate of the Criminal Investigator Training Program and Inspector General Investigator Training Program held at the Federal Law Enforcement Training Center in Glynco, Georgia.  As a DOL-OIG special agent, my duties include investigating fraud, waste, and abuse of various DOL programs.  I have conducted investigations of criminal activity involving unemployment insurance ("UI") fraud, workers' compensation fraud, and grant fraud.  Prior to my employment with DOL-OIG, I was employed as an investigator with the Wage and Hour Division of the U.S. Department of Labor.

## III. **SUMMARY OF PROBABLE CAUSE**

6.    Since late 2019, multiple federal law enforcement agencies have been investigating Edward Kim ("KIM") for several crimes and fraudulent schemes, including drug trafficking, the filing of false tax returns with stolen identities, and Employment Development Department ("EDD") fraud through the filing of false unemployment insurance claims.

7.    Over the course of the nearly year-and-a-half investigation, agents have determined that, among other things, (1) KIM conspired with others, and carried out, a conspiracy to ship approximately 449 grams of methamphetamine to co-

conspirators in Hawaii in a package addressed from "Edward Kim" to "Clear Point Logistics"; (2) KIM, in conspiracy with another individual, filed approximately 297 fraudulent tax returns using stolen identities in order to fraudulently claim Economic Impact Payments ("EIP"), resulting in a loss of $21,600 dollars; (3) KIM, potentially along with other co-conspirators, fraudulently applied for and received approximately $3.0 million in EDD funds; and mostly recently (4) KIM possessed approximately 22 grams of methamphetamine and other drugs and paraphernalia, including another package of drugs from "Clear Point Logistics," during a traffic stop by the La Habra Police Department ("LHPD").

8.   Throughout this period, law enforcement determined that KIM used multiple locations under his control to facilitate and perpetuate these crimes, including his apartment in Los Angeles (SUBJECT PREMISES 1), the residence of his girlfriend/partner and co-conspirator, PALOMA FOSTER ("FOSTER"), in Covina[1] (SUBJECT PREMISES 2), and a commercial space that KIM rents in La Habra (SUBJECT PREMISES 3), to apply for and receive fraudulent EDD claims and tax filings, and traffic drugs.  Most recently, law enforcement has observed KIM and FOSTER at a luxury apartment in downtown Los Angeles (SUBJECT PREMISES 4), which KIM began renting in July 2020, and for which he has paid portion of with EDD funds.

---

[1] The investigation revealed that KIM and FOSTER are or were in a romantic relationship and share a child.

9.    Finally, on November 15, 2020, the LHPD stopped KIM
for multiple violations of the California Vehicle Code.  This
stop was unrelated to the separate pending federal
investigations into KIM.  During the traffic stop, and after
learning that KIM was on probation with full search terms and
securing his consent, officers searched KIM's car and
belongings.  Among the items found in KIM's car were multiple
pieces of EDD mail in names other than KIM's name, multiple VISA
debit cards in names other than KIM's, approximately 22.049
grams of methamphetamine, other drugs, a digital scale, an
electroshock weapon (commonly referred to as a taser), and
$26,778 in cash.  Law enforcement also found a mail parcel
containing Alprazolam, which was addressed from "Clear Point
Logistics" at P.O. Box 2305, La Habra, California 90632 and
addressed to an individual in Colorado.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    HSI Investigates KIM for Distribution of
Methamphetamine in November 2019 from SUBJECT
PREMISES 2**

11.    Since October 2019, HSI has been investigating KIM for
distribution of methamphetamine.  That investigation began when
HSI received information from a LHPD source of information
("SOI"), who identified an individual named "Eddie Kim," as a

trafficker of drugs.[2]  Using law enforcement databases, LHPD determined the person identified as "Eddie Kim" was, in fact, KIM.  LHPD then provided a photo of KIM to the SOI, who positively identified KIM as the narcotics trafficker he knows as "Eddie Kim."

12.  Law enforcement then began surveillance on KIM in mid-November 2019.  On November 15, 2019, while conducting surveillance on KIM at SUBJECT PREMISES 2 (which law enforcement later learned was the backroom of a property his partner, FOSTER, rents and resides), LHPD observed KIM exiting SUBJECT PREMISES 2 carrying a shipping box.  LHPD saw KIM get into a car and drive to a FedEx store in West Covina, California.  LHPD observed KIM exit the car carrying the shipping box and enter the FedEx store.

13.  Law enforcement later saw KIM leaving that store with a stack of empty shipping boxes similar in size to the parcel he originally entered the FedEx store with.  After KIM departed, a LHPD detective went inside the FedEx store, identified himself to the FedEx employee, and inquired about the parcel KIM dropped off.  The FedEx employee assisted the LHPD detective in locating the parcel.  The parcel was sealed and labeled from Edward Kim at an address of 3010 Wilshire Boulevard, Los Angeles,

---

[2] The SOI was previously arrested on drug offenses and is working with local law enforcement in the hopes of leniency in prosecution and any potential sentence.  The SOI has the following felony criminal convictions:  possession of a controlled substance in 2007, 2011, and 2013; possession of a controlled substance for sale in 2007, 2008, 2010, 2016, and 2018; transportation of a controlled substance in 2007, 2016, and 2019; making and passing fictitious check in 2016; and possession of a stolen vehicle in 2019.

California 90010 and addressed to "Clear Point Logistics,"
located at 75-5660 Kopiko Street, Suite C7 #304, Kailua-Kona,
Hawaii.

14.   Law enforcement in Hawaii were advised of the package
destined to Kailua-Kona, and they obtained an anticipatory
search warrant for the parcel from U.S. Magistrate Judge Kenneth
Mansfield.   See Case No. 19-MJ-1199 (D. Hawaii).   The search
warrant was executed in Hawaii on November 18, 2019.   Inside the
package that KIM was seen mailing, law enforcement found
approximately 449.6 grams of methamphetamine.   Several co-
conspirators in Hawaii were ultimately arrested and charged
federally with conspiracy to distribute methamphetamine.

15.   Based on my discussion with other agents, federal
agents were planning to charge KIM along with his co-
conspirators located in Hawaii.   However, due to the COVID-19
pandemic, federal agents in Hawaii ultimately did not move to
arrest or charge KIM in Hawaii due to the travel restrictions
and quarantine.   Instead, the case was later referred to the
U.S. Attorney's Office in the Central District of California for
investigation.

**B.   In June 2020, IRS-CI Begins Investigating KIM for
Fraudulent Tax Filings Associated with SUBJECT
PREMISES 1 and 2**

16.   Separately, in June 2020, IRS-CI began investigating
KIM for filing fraudulent tax returns under stolen identities to
receive Economic Impact Payments ("EIP"), also known as stimulus
payments.

17.  KIM was first identified as being involved in suspicious tax filings through the EIP Lead Portal.  The EIP Lead Portal is an IRS database developed to combat fraud through identifying suspicious activity associated with non-filer EIP account creation.

18.  After a review of EIP Lead Portal data, IRS-CI identified 297 fraudulent returns filed by KIM and his partner, FOSTER.  The 297 returns were in various names other than the names of KIM and FOSTER.  These returns were linked to five separate banks accounts.  Of the 297 EIP returns, 129 returns listed SUBJECT PREMISES 1 as the taxpayer's address.

19.  IRS-CI then obtained bank records relating to these five bank accounts and determined all the accounts were owned by KIM or FOSTER.  For example, records obtained from Bancorp bank account ending in 6759 showed KIM as the sole account holder. This bank account was associated with 82 returns. Records obtained from Lili bank account ending in 8213 showed KIM as the sole account holder and a total of 89 returns were associated with this bank account.  Records obtained from BBVA USA bank account ending in 2343, Evolve bank account ending in 4718, and Bancorp bank account ending in 4606, showed FOSTER as the sole account holder with the listed address as SUBJECT PREMISES 2. These bank accounts in FOSTER's name were associated with 126 returns.

20.  Further investigation revealed that most of these returns were filed from the IP address of 76.170.55.188.  Law enforcement subsequently obtained subscriber information for the

IP address from Charter Communications.  According to Charter Communication, KIM was the subscriber of the IP address at the service address of SUBJECT PREMISES 1 at the dates and times that the returns were filed.

21.  The IRS-CI interviewed approximately seven individuals who had tax returns filed under their names which were associated with KIM or FOSTER.  All of the individuals indicated the filings were unauthorized and they confirmed they never gave either KIM or FOSTER permission to use their identities to file tax returns for EIP payments.

22.  IRS-CI linked KIM and FOSTER to the filing of at least 297 fraudulent tax returns by linking the returns to the bank accounts associated with KIM and FOSTER or at SUBJECT PREMISES 1.  These tax returns claimed EIP payments totaling approximately $356,400, of which $21,600 were released and paid to the bank accounts associated with KIM and FOSTER.

**C.  In Summer 2020, DOL-OIG Discovers KIM's Scheme to Fraudulently Obtain EDD Benefits Using SUBJECT PREMISES 1-3**

23.  In September 2020, while HSI and IRS-CI were investigating KIM for drug trafficking and filing false tax returns, DOL-OIG began investigating KIM for suspected EDD fraud after receiving the following tip from the Las Vegas Metropolitan Police Department ("LVMP").

1.  KIM is Arrested with EDD Cards in Las Vegas

24.  On September 15, 2020, LVMP arrested KIM after security at the hotel KIM was staying at observed methamphetamine and approximately 21 EDD cards inside KIM's

hotel room.  The hotel security observed the items in KIM's room while responding to a disturbance in the room and notified LVMP thereafter.  At time of the incident, KIM was present at the hotel with FOSTER.  FOSTER was not arrested, however.

25.  The 21 EDD cards found in KIM's room were not in KIM's name.  In a search incident to his arrest, LVMP searched KIM's person and found 11 additional EDD cards, for a total of 32 EDD cards, and approximately 17 grams of suspected methamphetamine.  LVMP <u>Mirandized</u> and interviewed KIM.  KIM told LVMP that the reason he had multiple EDD cards in his possession was because he helps people file unemployment claims in exchange for a 10-percent kickback from each of the EDD card owners.  LVMP referred the EDD cards to DOL-OIG.

       2.   <u>DOL-OIG Investigates the EDD Cards and Finds that KIM is Connected to Hundreds of Fraudulent Claims</u>

26.  DOL-OIG then began investigating KIM and the EDD cards that were found in his possession during the Las Vegas arrest. DOL-OIG first conducted a search of law enforcement databases and discovered that 22 of the EDD cards in KIM's possession were obtained by filing online applications for unemployment assistance from the IP address of 76.170.62.36 (the "Target IP Address").  Further investigation determined that approximately 400 claims were connected to KIM through the use of the common mailing addresses, IP addresses, or email address, all of which were found to be under KIM's or his co-conspirators' control.

27.  For example, DOL-OIG determined that all 32 EDD cards found in KIM's possession during the Las Vegas arrest listed

locations under KIM's control as the mailing address on the online EDD applications.  Specifically, 18 EDD cards listed SUBJECT PREMISES 1, as the claimant's mailing address on EDD claims, and 1 card listed the home of KIM's parents, as the claimant's mailing address.  In addition, 11 EDD cards listed an apartment at 951 South Beach Boulevard in La Habra, California ("KIM's Former Beach Boulevard Apartment"), which law enforcement determined was KIM's apartment from approximately June 11, 2020 until recently based on lease records.  Two additional cards used the mailing address of 964 East Badillo Street # 436, Covina, CA 91724, which is a private mailbox rented by KIM.[3]

   3.   DOL-OIG Tracks Hundreds of Additional EDD Claims to KIM at SUBJECT PREMISES 1 through 3

28.   Broadening their investigation, DOL-OIG reviewed additional EDD claims records which showed that at least 78 claims used SUBJECT PREMISES 1 and an additional 170 claims used KIM's Former Beach Boulevard Apartment as their respective mailing addresses on the EDD applications.

29.   DOL-OIG continued its investigation by looking at all other EDD applications filed from the Target IP Address, which was used to file applications for 22 of the 32 EDD cards that were found in KIM's possession in Las Vegas on September 15, 2020.  This analysis showed that at least an additional 114 EDD

_____

[3] This address is associated with at least 43 unemployment insurance claims.

claims were filed from the Target IP Address between May 2020 and July 2020.

30.  DOL-OIG subpoenaed subscriber information for the Target IP Address from Charter Communications.  Charter reported that KIM was the subscriber of the Target IP Address, with a service address of SUBJECT PREMISES 1, at the time the fraudulent EDD claims were filed.

31.  DOL-OIG reviewed additional EDD claims records, which showed at least four other claims, including FOSTER's own EDD claim, used SUBJECT PREMISES 2 as their respective mailing address on the EDD applications.  Additionally, law enforcement determined that FOSTER was the subscriber of IP address 76.91.184.115, which was used to file at least 80 claims, including four of the EDD cards in KIM's possession during the Las Vegas arrest.

32.  Further analysis of EDD claims records showed at least 17 claims used SUBJECT PREMISES 3 as their respective mailing address on the EDD applications.

        4.   <u>DOL-OIG Determines That Many of the Fraudulent EDD Claims are in Inmates' Names</u>

33.  DOL-OIG also determined that 23 of the 32 EDD cards in KIM's possession during the Las Vegas arrest were in names of incarcerated California Department of Corrections and Rehabilitation ("CDCR") inmates.  Inmates are not eligible to apply for unemployment insurance ("UI") benefits because they are not unemployed through no fault of their own; able and available for work; and/or actively seeking work.  The EDD

applications for these 23 inmate-claims each reported being
unemployed as a direct result of COVID-19 and an annual income
of $72,000.  This reported income on the fraudulent applications
caused EDD to pay the maximum amount, thereby maximizing the
fraud and benefits received.  None of these applications
provided driver's license information either, which is requested
on the applications for verification purposes.

34.  The table below provides a sample of the EDD inmate-
claims that were tracked to KIM.  Notably, each of the claims
share commonalities, including unemployment reason, reported
income, affected work date, and lack of driver's license for
verification.  Each of the claims also used an address
controlled by KIM, including SUBJECT PREMISES 1, KIM's Former
Beach Boulevard Apartment, and KIM's private mailbox.

| State Claim Filed | Reason Unemployed | Claimant | Provided Driver's License | Stated Income | Date Work Affected | Date Claim Filed | Amount of Claim and Status | Incareation Dates in CA |
|---|---|---|---|---|---|---|---|---|
| CA | COVID-19 | M.B. | N | $72,000.00 | 2/2/2020 | 5/16/2020 | Approved $23,100 | 1/23/2017 to Present |
| CA | COVID-19 | W.B. | N | $72,000.00 | 2/2/2020 | 5/30/2020 | Approved $22,800 | 12/28/2017 to Present |
| CA | COVID-19 | Y.B. | N | $72,000.00 | 2/2/2020 | 6/4/2020 | Approved $18,300 | 5/3/2016 to Present |
| CA | COVID-19 | E.C. | N | $72,000.00 | 2/5/2020 | 7/4/2020 | Approved $21,450 | 2/8/2019 to Present |
| CA | COVID-19 | B.D. | N | $72,000.00 | 2/12/2020 | 7/4/2020 | Approved $21,450 | 1/28/2010 to Present |
| CA | COVID-19 | J.G. | N | $72,000.00 | 2/2/2020 | 7/4/2020 | Approved $22,800 | 12/16/2019 to Present |
| CA | COVID-19 | I.H. | N | $72,000.00 | 2/4/2020 | 7/4/2020 | Approved $22,800 | 11/19/2015 to Present |
| CA | COVID-19 | E.I. | N | $72,000.00 | 2/3/2020 | 7/9/2020 | Approved $22,800 | 3/16/2010 to Present |
| CA | COVID-19 | A.K. | N | $72,000.00 | 2/2/2020 | 7/25/2020 | Approved $22,800 | 9/10/2010 to Present |
| CA | COVID-19 | B.K. | N | $72,000.00 | 2/2/2020 | 7/25/2020 | Approved $21,900 | 10/13/2011 to Present |

35.  DOL-OIG further investigated each of these inmate-
claims through a review of EDD records, CDCR records, and

discussions with CDCR representatives.  Below are examples of
some of the findings:

      a.    <u>Inmate-Claimant I.H.</u>:  An EDD claim in I.H.'s
name and using I.H.'s social security number was filed on July
4, 2020.  EDD claim records indicate that I.H.'s claim for EDD
benefits reported that he lost work due to COVID-19 and earned
an annual salary of $72,000 before his loss of employment.  His
reported last day of work was June 27, 2020; however, CDCR
records indicate that I.H. has been incarcerated since November
19, 2015.  Further investigation revealed that the Target IP
address, registered to SUBJECT PREMISES 1, was used to file the
claim.  Kim's Former Beach Boulevard Apartment was listed as
I.H.'s mailing address on the application.  Bank of America
("BofA") records indicate that an EDD debit card issued in the
name of I.H., ending 9474, was mailed to Kim's Former Beach
Boulevard Apartment on July 10, 2020.  BofA records indicate
that I.H.'s card was used multiple times from July 19, 2020 to
September 13, 2020, including 9 purchases totaling $2,300.86 and
20 ATM withdrawals totaling $20,003.  Surveillance footage
associated with the ATM withdrawals show a person matching KIM's
description, as well as currently unknown associates, making
multiple withdrawals using the card in I.H.'s name.

      b.    <u>Inmate-Claimant W.B.</u>:  An EDD claim in W.B.'s
name and using W.B.'s social security number was filed on May
30, 2020.  EDD claim records indicate that W.B.'s claim for EDD
benefits reported that he lost work due to COVID-19 and earned
an annual salary of $72,000 before his loss of employment.  His

reported last day of work was May 23, 2020; however, CDCR records indicate that W.B. has been incarcerated since December 28, 2017.  Further investigation revealed that the Target IP address, registered to SUBJECT PREMISES 1, was used to file the claim.  SUBJECT PREMISES 1 was also listed as W.B.'s mailing address on the application.  BofA records indicate that an EDD debit card issued in the name of W.B. was mailed to SUBJECT PREMISES 1 on June 5, 2020.[4]

   c. <u>Inmate-Claimant E.I.</u>:  An EDD claim in E.I.'s name and using E.I.'s social security number was filed on July 9, 2020.  Similar to the other claims, EDD claim records indicate that E.I.'s claim for EDD benefits reported that he lost work due to COVID-19 and earned an annual salary of $72,000 prior his loss of employment.  His reported last day of work was July 4, 2020; however, CDCR records indicate that E.I. has been incarcerated since March 16, 2010.  EDD records indicate that IP address 172.118.206.165 was used to file the claim.[5]  Further investigation revealed that E.I.'s application listed KIM's Former Beach Boulevard Apartment as the mailing address.  BofA records indicate that a debit card, ending in 4746, was issued in E.I.'s name and mailed to KIM's Former Beach Boulevard

---

[4] KIM had this card in his possession when LVMPD arrested him on September 15, 2020, and it was subsequently seized. Following its seizure, BofA records indicate another card was issued to W.B. and mailed to SUBJECT PREMISES 1 on September 21, 2020.  This second card was found in KIM's possession during the November 15, 2020 arrest in La Habra, California.

[5] This IP address was also used in at least 56 EDD claims, 54 of which used KIM's Former Beach Boulevard Apartment as the mailing address.

Apartment on July 13, 2020.  Later, BofA surveillance shows a man matching KIM's description making a $1,000 withdrawal from a BofA ATM located near Beach Boulevard and La Habra Boulevard in La Habra, California on August 27, 2020.

36.  Further review of additional Bank of America surveillance shows a suspect matching KIM making numerous $1,000 withdrawals using EDD cards in names other than his own.  Many of these withdraws occurred at ATMs near SUBJECT PREMISES 1.

       5.   <u>DOL-OIG Determines that KIM is Responsible for over $3.0 Million Fraudulent EDD Payments and That He and Others Withdrew At Least $1.9 Million in Cash</u>

37.  All told, DOL-OIG agents determined that KIM has filed or caused the filing of at least 400 fraudulent EDD claims, with at least 120 of these fraudulent claims filed in the name of inmates at California correctional institutions.  Ultimately, DOL-OIG determined that EDD paid out at least $3.0 million on the approximately 400 EDD claims associated with KIM from approximately March 30, 2020 to September 8, 2020.

38.  A significant portion of EDD benefits that were paid, at least $1.9 million, were withdrawn in cash ATM withdrawals by KIM and unknown co-conspirators.  As a result, law enforcement believes that KIM still possesses a significant amount of cash at any one or multiple SUBJECT PREMISES.  Indeed, in this regard, law enforcement learned that, in late September 2020, KIM made multiple large cash purchases, including a brand new,

2020 model year Dodge Ram Rebel truck, which KIM purchased with
approximately $81,500 in cash.[6]

> **D.    LHPD Stops KIM in November 2020 and Finds
> Methamphetamine and Drugs in a "Clear Point Logistics"
> Parcel**

39.    Most recently, KIM was arrested by local police and
found to be in possession of methamphetamine, additional EDD
materials, and a package of drugs from "Clear Point Logistics."

40.    Specifically, at approximately 12:55 a.m. on November
15, 2020, LHPD pulled over KIM, who was driving alone in his new
Dodge Ram Rebel truck, for multiple violations of the California
Vehicle Code.  Before the stop, LHPD first saw KIM's truck
depart the business complex where SUBJECT PREMISES 3 is located.
Upon exiting the complex, an officer saw the truck enter an
intersection, then it suddenly braked and stopped.  The truck
then reversed back into the business complex where SUBJECT
PREMISE 3 was located, in violation of California Vehicle Code
Section 22106.  The officer then saw the truck wait for
approximately 45 seconds behind the limit line with its turning
signal activated.  The officer then saw that the truck had
heavily tinted windows and lacked a front license plate, both
violations of the California Vehicle Code.  As the officer
passed the truck, the truck then made an immediate right turn,
opposite its original direction of travel, and sped off.  The
officer made a U-turn and visually observed the truck going
approximately 80 miles per hour, in violation of the 50 mile per

---

[6] Notably, during the relevant time period, KIM had no
reported wage income, according to EDD.

hour speed limit.  The officer then conducted a traffic stop of
the truck.

41.  After pulling over the truck, LHPD ran a records check
on KIM, which showed that KIM was on formal probation through
Los Angeles County with full search and seizure terms, including
his person and any vehicles under his control.  The truck came
back registered to KIM at SUBJECT PREMISES 4.

42.  KIM told officers that he was driving home from work,
which he identified as a business that he owned.  Officers later
found a utility bill for SUBJECT PREMISES 3 in the truck.  LHPD
then asked KIM what he was on probation for.  KIM responded
"sales."[7]  When they asked what he was selling, KIM responded
"drugs."  The officers then asked, "what kind of drugs?"  KIM
responded, "meth."[8]

43.  Pursuant to the terms of KIM's probation, LHPD asked
KIM to exit the truck.  LHPD then conducted a search of his
person.  During the search, LHPD discovered a large quantity of
cash in KIM's back pocket, which KIM identified as $10,000 cash

---

[7] The quotes are not verbatim as no transcript from the stop
exists at this time.  Rather, the quotations reflect what KIM
said in substance based on the officer's body-worn camera
footage.

[8] A subsequent review of KIM's criminal history reveals that
he has several convictions, including, among others, a
conviction for manufacturing a controlled substance in 2014;
possession of a controlled substance in 2014; misdemeanor
burglary in 2014; bringing a controlled substance into prison in
2015; possession of a controlled substances in 2016; possession
of a controlled substances in 2017; possession of 10 or more IDs
with intent to defraud in 2019; and possession of a controlled
substance for sale in 2019.

in $100 bills.  KIM said the money was for his rent, which he
said was approximately $6,000 per month.

44.  Officers then asked if there was any methamphetamine
in the car.  KIM responded no.  Officers then asked KIM if they
could search the truck.  KIM consented and asked them to make it
quick.

45.  Officers then searched the truck pursuant to both
KIM's search terms and his consent.  Upon immediately opening
the passenger door, and within seconds of starting the search,
officers saw suspected methamphetamine residue and a suspected
rock of methamphetamine in the truck's passenger side door
panel.  Officers explained to KIM what they had found in this
car.  Upon hearing they found methamphetamine, KIM said, "I
don't have any."  In response, an officer stated that she "could
see it in the side of his car."  KIM responded, "what do you
mean?"  At that point, the officer took the suspected
methamphetamine rock from the car and walked it over to show KIM
directly.  The officer even shined her flashlight on it.  KIM
continued to appear to play coy, and said, "what is that?"  KIM
claimed he "had no idea" what it was and asked the officer "are
you sure?" when she told him it was methamphetamine.

46.  Officers then continued the search of KIM's truck.
During the search, officers located a black bag on the front
seat containing a digital scale covered in suspected
methamphetamine residue, a glass jar of marijuana, a computer
hard drive, and a black container labeled as "moonrocks."  The
officer asked KIM what "moonrocks" were.  KIM responded that

19

they were a type of marijuana, indicating that he knew about the contents of the bag and had control over the items inside, including the digital scale.  Inside the car, officers also found a fluorescent grow light still inside its original packaging and other items related to the cultivation of marijuana.  KIM told officers he was growing marijuana for personal consumption.

47.  In the front seat of the vehicle, LHPD located a sealed mail parcel, which was labeled from "Clear Point Logistics," P.O. Box 2305, La Habra, California 90632 and addressed to an individual in Colorado.[9]  LHPD asked KIM if that parcel belonged to him.  KIM only answered that it was outgoing mail.  Based on the fact that KIM had possession of this parcel in the truck, knew of the outgoing status of the parcel, and was on probation with search terms, LHPD opened the parcel.  Within the parcel, officers found white rectangular pills believed to be Alprazolam (also known as Xanax).

48.  In the truck's backseat, LHPD found an orange backpack which contained an electroshock weapon (commonly referred to as a taser) and a white pill bottle with KIM's name in the front zippered compartment along with bills in KIM's name.  The larger compartment of the backpack was locked closed with a combination lock.  LHPD asked KIM for the combination to the lock on the backpack.  KIM stated the backpack did not belong to him and that it belonged to his girlfriend.  Based on the fact that KIM

---

[9] Clear Point Logistics was the company on the package containing methamphetamine that KIM was seen mailing to Hawaii in November 2019, as discussed above.

was on probation and subject to search terms, the truck was registered to KIM (who was the sole occupant), and KIM's property (including his prescription medication and bills) was found inside the backpack, officers forced entry into the backpack with a knife.

49.   Within the locked compartment, LHPD located several pieces of EDD mail, bills, booking information from a prior arrest of KIM, two cell phones, several Visa cards in various individuals' names other than KIM's, two clear plastic baggies, and a black container containing what later tested positive for approximately 22.049 grams of methamphetamine.  Notably, many of EDD cards and EDD mailings found in the truck were addressed to various individuals at SUBJECT PREMISES 1.  Officers also located a yellow pill bottle labeled with a female's name. Inside that bottle, LHPD located three different types of pills, one of which was suspected to be Alprazolam.

50.   During the search of the truck, officers also found an additional stack of cash, similar to the stack of cash found on KIM, as well as a third stack of cash in some bags.  All told, officers seized approximately $26,778 in cash from KIM's person and the truck.

51.   Officers arrested KIM for the possession of the drugs and seized his digital devices, contraband, cash, bags, debit cards, EDD materials, and other items as evidence.  The truck was impounded as evidence.

52.   On December 14, 2020, Magistrate Judge Gail J. Standish issued a federal search warrant for KIM's truck

and the four digital devices found inside.  Law enforcement then
executed a search of the truck.  During the search, officers
found a Spectrum Business mailing addressed to "Clear Point
Logistics" at SUBJECT PREMISES 3, causing them to believe that
Clear Point Logistics is operating from that location.  Officers
also found the truck's DMV registration, which listed KIM as the
registered owner at SUBJECT PREMISES 4, a Colorado state ID with
KIM's name and image, and mailing address to KIM at KIM's Former
Beach Boulevard apartment, and 3010 Wilshire Boulevard, Los
Angeles, California, among others.

        53.  In addition, officers found a notebook inside KIM's
truck.  Inside the notebook, officers found, among other items,
a bill of sale for an Aprilia motorcycle for $9,500 cash on
September 4, 2020 as well as documents referencing KIM's
purchase of a Harley Davidson motorcycle in cash on or around
September 8, 2020.  The notebook also contained a handwritten
ledger of expenses, including expenses for "Ram Truck $60K,"
"Ducati 1199 $15K," and "Aprilia RSV4 $15k," which appear to be
references to KIM's truck and motorcycles.  The handwritten
ledger also includes cash notations, including "$80K cash,"
"$90k cash, "$290K cash," and "$120K cash Mom."

        54.  A search of the digital devices found in KIM's truck
revealed, among other items, numerous images of large quantities
of suspected methamphetamine, significant quantities of cash,
miscellaneous pills, a pill press, and a gun.  There were also
images of notes that referenced a pill press and bitcoin.  The
digital devices also included indicia of KIM's ownership,

including pictures of his driver license, photos of himself (including KIM holding cash), references to Clear Point Logistics, and receipts for Clear Point Logistics shipments to Hawaii in November 2019.

55.   In addition, the digital devices contained a screenshot of a conversation between a person believed to be KIM and an individual named Peter.  KIM appears to say "I need to know ASAP it's very important.  I got 50K on the line here bro." Peter responds, "Yo eddie I just told you how I feel after taking a qtr of it . . . I just snorted half of one so I told you I'll let you know here soon if I feel anything."  Based on my training and experience and conversations with other law enforcement officers, I believe this conversation is in reference to the production and distribution of illicit drugs.

**E.   Law Enforcement's Investigation and Continued Surveillance of KIM Shows He Operates Out of All SUBJECT PREMISES and Has Connections to Each**

56.   During the investigation, law enforcement has identified KIM's multiple contacts at each of the SUBJECT PREMISES.  As a result of these pending investigations, law enforcement believes the SUBJECT PREMISES contain evidence related to these investigations, including, but not limited to, drug trafficking and EIP and EDD fraud.  Law enforcement also believes these SUBJECT PREMISES likely contain large amounts of cash from the approximately $3.0 million in fraudulent EDD funds that KIM received.

1.   <u>SUBJECT PREMISES 1 – KIM's Apartment</u>

57.  Based on records provided from the landlord, law enforcement determined that KIM is the current lessee of SUBJECT PREMISES 1, an apartment in Los Angeles, since April 2020 through the present.  Moreover, law enforcement determined that rent payments for SUBJECT PREMISES 1 were paid from KIM's Bancorp 6759 account and EDD cards in the names of two CDCR inmates, including one found in KIM's possession during his Las Vegas arrest.  Each EDD card used SUBJECT PREMISES 1 as a mailing address.

58.  Around the fall 2020, the owner of SUBJECT PREMISES 1 reported to law enforcement that an unknown white male was staying at SUBJECT PREMISES 1.  The owner reported that the unidentified white male was creating disturbances at SUBJECT PREMISES 1, including climbing down apartment balconies and, more recently, stealing artwork and packages from the common areas.  The owner observed the white male on numerous occasions waiting for the mail man, who handed mail directly to him instead of putting them in the mailboxes located in the lobby. The owner reported seeing on one occasion about 50 EDD letters all addressed to different individuals and the postal carrier could not fit them all into the mailbox for SUBJECT PREMISES 1. When the owner asked the white male who he was, the white male told the owner that he is an associate of KIM's and that he is taking care of things for KIM at SUBJECT PREMISES 1.  When the owner asked the white male to sign a lease for the unit, the white male stated that he does not live there and is just taking

24

care of business for KIM while KIM is in Denver.  The owner
stated he called KIM approximately a month ago to ask for
overdue rent payment, and KIM stated during the call that he is
having issues with his account and will be sending payment soon.

59.  Law enforcement reviewed surveillance from SUBJECT
PREMISES 1 containing the unidentified white male.  Law
enforcement subsequently determined that the unidentified white
male seen at SUBJECT PREMISES 1 matched the description of a co-
conspirator who was seen on BofA surveillance withdrawing money
from fraudulently-issued EDD cards.  For example, BofA
surveillance shows the unidentified white male seen at SUBJECT
PREMISES 1, and an unidentified Asian female recently seen
entering SUBJECT PREMISES 1 on February 5, 2021, have also made
multiple ATM withdrawals from EDD cards that were found in KIM's
possession during his Las Vegas arrest.  BofA surveillance shows
the unidentified white male making withdrawals on at least a
dozen occasions from various cards found in KIM's possession
during his Law Vegas arrest.  For instance, on August 16, 2020,
the unidentified white male withdrew $1,000 from an EDD card in
the name of CDCR inmate I.H.  Based on Google Maps, this BofA
ATM is approximately 0.3 miles from SUBJECT PREMISES 1.[10]

60.  Additionally, on July 22, 2020, the unidentified Asian
female recently seen entering SUBJECT PREMISES 1 withdrew $1,000

_____

[10] As discussed below, I know it is common for EDD
fraudsters to send EDD correspondence to addresses under their
control, rather than where they actually live.  This allows the
fraudster to access the mail while putting one layer of
separation between themselves and the mailings in order to evade
detection by law enforcement.

from three EDD cards at a BofA ATM located near Western Avenue
and Olympic Boulevard in Los Angeles.  Again, each of the cards
used for those withdrawals were found in KIM's possession during
his Las Vegas arrest, including one in the name of CDCR inmate
E.I.

61.  Most recently, law enforcement has observed one of
KIM's cars in the vicinity of SUBJECT PREMISES 1.  Specifically,
in January 2021, LHPD received a GPS warrant for one of KIM's
cars from Orange County Superior Court Judge Nancy Zeltzer.[11]
This GPS tracker shows pings from KIM's car within the vicinity
of SUBJECT PREMISES 1 on several occasions, with one ping as
recently as February 4, 2021, which was within 10 to 15 meters
of SUBJECT PREMISES 1.

62.  Recent postal records show that, on February 9, 2021,
KIM placed a mail hold for all mail delivered to SUBJECT
PREMISES 1.  The mail hold began on February 9, 2021 with an end
date of March 11, 2021.  The instructions on the hold state
"Please do not deliver to mailbox and only release to the
authorized tenant on the leasing agreement, Mr. Edward Kim."

63.  Further review of EDD records shows that additional
EDD mailings were mailed to SUBJECT PREMISES 1 2021 as recently as
January 2021.

64.  All told, law enforcement connected SUBJECT PREMISES 1
to approximately 78 fraudulent EDD applications and 129
fraudulent tax returns.

_____

[11] KIM has additional cars and motorcycles which were not
tracked.  Thus, law enforcement is only aware of the movements
of one of KIM's vehicles.

2.   <u>SUBJECT PREMISES 2 – FOSTER's Residence</u>

65.   SUBJECT PREMISES 2 is the backroom or any other areas under PALOMA FOSTER's control, whether attached or unattached, at the single-family residence located at 113 South Grandview Avenue, Covina, CA 91723.  During the investigation, law enforcement spoke with the owner of the property who told law enforcement that he rents a "backroom" to FOSTER.  During the investigation, law enforcement and other witnesses have identified KIM and FOSTER as being present at SUBJECT PREMISES 2 throughout the relevant periods.  A review of the CLEAR database also shows that FOSTER and KIM are associated with SUBJECT PREMISES 2.

66.  Most recently, law enforcement observed FOSTER at SUBJECT PREMISES 2 on February 13, 2021.  Further review shows that FOSTER is still using SUBJECT PREMISES 2.  For example, she recently renewed her driver's license and listed SUBJECT PREMISES 2 in the renewal application, dated February 3, 2021.  In addition, FOSTER recently confirmed SUBJECT PREMISES 2 as her mailing address on her own individual EDD application, which she updated on February 15, 2021.

67.  As a result, law enforcement believes that FOSTER and KIM still occasionally reside at and have access to SUBJECT PREMISES 2.

68.  All told, law enforcement connected SUBJECT PREMISES 2 to approximately four fraudulent EDD applications and three bank accounts registered in FOSTER's name at this address were linked to dozens of fraudulent tax return filings.

3.   SUBJECT PREMISES 3 – KIM's Corporate Suite

69.   SUBJECT PREMISES 3 is a corporate suite that KIM is
currently renting in the name of "Clear Point Logistics."  Law
enforcement believes it may be associated with KIM's drug
trafficking activities.

70.   Law enforcement has surveilled SUBJECT PREMISES 3 on
multiple occasions.  During this surveillance, the corporate
suite appears vacant.  It has no visible signage and no name on
the door or elsewhere, as depicted in the picture below.  It
does not appear open to the public.  Law enforcement, however,
observed KIM's cars at SUBJECT PREMISES 3 on multiple occasions.



71.   Law enforcement subsequently conducted additional
investigation into Clear Point Logistics.  That investigation
revealed that Clear Point Logistics is a California-registered
Limited Liability Company.  According to the Secretary of State,
the business was registered on June 17, 2020.  The entity's
mailing address is listed as KIM's Former Beach Boulevard
Apartment.  Legalzoom.com is the listed agent for service of

process for Clear Point Logistics.[12]  Further investigation determined that Clear Point Logistics is not registered to do business in the City of La Habra.  The City of La Habra has no records of any business or person at SUBJECT PREMISES 3, and it considered the unit to be vacant.

72.  Law enforcement obtained the landlord of the building housing SUBJECT PREMISES 3.  The records revealed that that, on July 14, 2020, KIM, acting as a guarantor, entered into a one-year lease for SUBJECT PREMISES 3 on behalf of Clear Point Logistics.  The lease term runs from August 1, 2020 to July 31, 2021.  Leasing records for SUBJECT PREMISES 3 also list KIM as a representative of Clear Point Logistics with a contact address as SUBJECT PREMISES 1.

73.  Most recently, law enforcement has repeatedly seen KIM's cars at SUBJECT PREMISES 3, including as recently as February 25, 2021.  Law enforcement has also observed KIM's father at SUBJECT PREMISES 3.

74.  Based on the investigation as a whole, and the evidence set forth above, law enforcement believes that KIM and any co-conspirators are not engaged in legitimate business activity and that SUBJECT PREMISES 3 and Clear Point Logistics are permeated by fraud.  Among other things, this is because the business entity was only recently created; the business entity was created using the services of Legalzoom.com, which was paid

---

[12] One of the EDD card associated with KIM had multiple Legalzoom.com charges, including a registered agent fee, from between June and July 2020, the time when Clear Point Logistics was organized.

for with fraudulently obtained EDD funds; the business entity is not registered to do business in the City of La Habra; the City of La Habra has no record of any business or person currently at SUBJECT PREMISES 3; SUBJECT PREMISES 3 appears vacant from the outside; SUBJECT PREMISES 3 has no visible signage or name on the exterior; SUBJECT PREMISES 3 shows no signs of any legitimate business activity; SUBJECT PREMISES 3 was used as a mailing address for 17 EDD claims, including at least 7 identified as from inmates; and, finally, KIM appears to be using the name Clear Point Logistics to ship drugs around the country, including methamphetamine to Hawaii and Alprazolam to Colorado.

      4.   <u>SUBJECT PREMISES 4 – KIM's New Luxury Apartment</u>

75.  Lastly, law enforcement involved in the investigation believes that SUBJECT PREMISES 4 is KIM's new downtown luxury apartment.  Leasing documents indicate KIM began leasing SUBJECT PREMISES 4 on July 25, 2020.  Moreover, law enforcement believes that KIM is using money received from EDD to pay for this apartment.  Specifically, BofA records indicate that a fraudulently-obtained EDD card associated with KIM was used to pay for fees related to the rental application of SUBJECT PREMISES 2.[13]  In addition, KIM listed SUBJECT PREMISES 4 as the address on the sale documents for the Dodge truck he purchased on September 28, 2020.

---

[13] The application for this EDD card was filed from the Target IP Address with a mailing address of KIM's Former Beach Boulevard Apartment.

76.   Law enforcement believes that KIM is residing at
SUBJECT PREMISES 4 and FOSTER is known to frequent the residence
as well.   Specifically, in mid-January 2021, law enforcement
observed KIM's motorcycle and FOSTER's car present at SUBJECT
PREMISES 4.   In addition, the landlord of SUBJECT PREMISES 4
provided law enforcement with recent surveillance showing KIM at
SUBJECT PREMISES 4.

**V.   BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND
COIVD-19 RELATED FRAUD**

77.   Since 1935, the U.S. Department of Labor's
Unemployment Insurance ("UI") program has provided unemployment
benefits to eligible workers who become unemployed through no
fault of their own.   This program ensures that at least a
significant portion of the necessities of life--most notably
food, shelter, and clothing--are met on a weekly basis while the
worker seeks employment.   UI beneficiaries who meet the
requirements of the applicable state law are eligible for this
temporary financial assistance.   Each state administers a
separate UI program within the guidelines established by Federal
law.   In California, the EDD administers the UI program for
residents and others physically performing work activities in
California.

78.   Generally speaking, regular UI claimants must be:
(1) unemployed through no fault of their own; (2) able and
available for work; (3) willing to accept suitable work; and (4)
actively seeking work.

79.   On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.  The CARES Act included, among others, the establishment of (1) the Pandemic Unemployment Assistance ("PUA") benefit to provide financial assistance to individuals who are out of work due to the pandemic, including those who do not usually qualify for regular state UI such as self-employed, contract, and "gig workers," (2) the Pandemic Emergency Unemployment Compensation ("PEUC") benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim, and (3) the Pandemic Additional Compensation ("PAC") benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020 and July 25, 2020.

80.  Prior to the enactment of the CARES Act, to be eligible for UI administered by California's EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

81.  Under the PUA program, workers who are not eligible
for regular UI benefits but are unemployed or partially
unemployed for a COVID-19-related reason permissible under
federal law may receive unemployment benefits for up to 46
weeks.  Under the PEUC program, workers who are eligible for the
regular UI benefits for up to 26 weeks may receive an additional
13 weeks of benefits for a total of 39 weeks.  Under the PAC
program, an individual receiving a regular UI benefit, a PUA
benefit, or a PEUC benefit between March 29, 2020 and July 25,
2020, the EDD pays an additional $600 in CARES Act funds to each
week of benefits.

82.  California EDD began accepting applications for PUA
benefits on or about April 28, 2020.  To make benefits available
as quickly as possible, payments are issued in phases.  If a
claimant qualifies for PUA benefits, the minimum payments are as
follows based on the claim's start date:

a.  Phase 1: For claims with start dates from
February 2, 2020 to March 28, 2020, $167 per week for each week
the claimant is unemployed due to COVID-19.

b.  Phase 2: For claims with start dates from March
29, 2020 to July 25, 2020, $167 plus $600 per week for each week
the claimant is unemployed due to COVID-19.

c.  Phase 3: For claims with start dates from July
26, 2020 to December 26, 2020, $167 per week for each week the
claimant is unemployed due to COVID-19.

83.   PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

84.   A UI claimant can usually collect 26 weeks of regular state UI benefits.  As noted above, the CARES Act allows for additional PEUC benefit to provide up to 13 weeks of additional payments, for a total of 39 weeks of benefits.  PEUC is available to persons who were or are fully or partially unemployed at any time between from March 29, 2020 through December 26, 2020.  Persons with a regular UI claim, a PUA claim, or a PEUC extension filed between March 29, 2020 and July 25, 2020, also receive Federal Pandemic Unemployment Compensation ("FPUC"), which is the extra $600 per week. Between July 25, 2020 and September 5, 2020, the FPUC benefit amount was an extra $300 per week, instead of an extra $600 per week.

85.   Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  EDD may request documentation to provide proof of the stated income.[14] If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using

---

[14] In general, EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

other resources available to EDD in order to increase the PUA
weekly benefit amount.

86.   Like regular UI claims, PUA claims can be filed
online.  When an individual files a PUA claim online, EDD
automatically maintains certain information regarding the filing
of the claim.  This information includes the date and time the
claim was submitted, the name of the person for whom the claim
was filed, and the Internet Protocol ("IP") address of the
computer, or Internet Service Provider ("ISP") account, that was
used to file the claim.

87.   A PUA claimant must answer various questions to
establish his or her eligibility for PUA benefits.  The claimant
must provide his or her name, social security number, and
mailing address.  The claimant must also identify a qualifying
occupational status and COVID-19-related reason for being out of
work.

88.   After it accepts a UI claim, including a claim
submitted pursuant to the PUA program, EDD typically deposits UI
funds every two weeks to a BofA-administered Electronic Benefit
Payment ("EBP") debit card, which the claimant can use to pay
for his/her expenses.  This EBP card is sent via the U.S. Postal
Service to the claimant at the address the claimant provides in
their UI claim.  Claimants can activate their debit card over
the phone or online.

89.   When receiving regular UI benefits, a claimant must
complete a Continued Claim Form (DE 4581) and certify every two
weeks, under penalty of perjury, that he/she remains unemployed

35

and eligible to receive UI benefits.  EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.[15]

90.  The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines and point of sale (POS) purchases at merchants across the United States.

91.  Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

a.  Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from

---

[15] The combination of regular UI, PUA, and/or FPUC claims are henceforth collectively referred to as "UI claims." Similarly, the combination of regular UI, PUA, and/or FPUC benefits are henceforth collectively referred to as "UI benefits."

other fraudsters or from the Dark Web[16] (using cryptocurrency such as Bitcoin) and verify that the PII belongs to real persons by checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

        b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  In this regard, fraudsters sometimes typically do not use their actual residences, but rather other addresses they control, in order to evade detection.  Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

        c.    Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

        d.    Providing the same phone number or no phone number for multiple UI claims for different claimants.  The phone number is usually one the schemers control.

        e.    Submitting multiple UI claims without providing a driver's license number or state identification number.

---

[16] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

## VI. <u>TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES</u>

92.   Based on my training, education, and experience, and discussions with other law enforcement personnel, along with information provided by sources of information and confidential sources, I know the following:

a.   UI fraudsters often keep large amounts of United States currency on hand.  Fraudsters commonly maintain such currency where they have ready access to it, such as in their homes and vehicles.  It is also common for fraudsters to possess proceeds and items purchased with proceeds in their homes and vehicles.  Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of UI defrauders.

b.   UI fraudsters often maintain UI debit cards and mailing distributed by state workforce agencies ("SWA") in order to continue to receive the funds and utilize them through ATM transactions or point of sale purchases.  Fraudsters commonly maintain such items in homes, businesses, or in their vehicles.

c.   UI fraudsters often maintain paper records of their fraudulent UI activity.  Such records are commonly maintained for long periods of time and therefore are likely to be found at the SUBJECT PREMISES.

d.   UI fraudsters commonly use computers, cellular telephones, and other electronic devices to communicate with other fraudsters about their defrauding activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet and applications based communication

forums to obtain and distribute personal identifying
information.  The fraudsters also utilize these devices to apply
for the UI benefits and to transfer and/receive the benefits.
Therefore, evidence related to UI defrauding is likely to be
found on electronic storage media found at the SUBJECT PREMISES,
as further described below.

e.   In addition to items which may constitute
evidence, fruits and/or instrumentalities of the crimes set
forth in this Affidavit, I also request permission to seize any
articles tending to establish the identity of persons who have
dominion and control over the SUBJECT PREMISES, including rent
receipts, utility bills, telephone bills, addressed mail,
personal identification, keys, purchase receipts, sale receipts,
photographs, vehicle pink slips, and vehicle registration.

93.  Based on my training and experience, conversations
with other law enforcement officers, and familiarity with
investigations into fraud and money laundering involving false
tax returns (including government stimulus payments), I know
that individuals scheming to fraudulently obtain economic
assistance payments generally follow recognizable patterns,
including the following, among others:

a.   Filing fraudulent tax returns in other persons'
names to collect government funds.  In some instances, the tax
returns are from victims of identity theft; in other instances,
the tax returns or claims are from people who have provided
their personal identifying information to the schemers and have
agreed to pay the schemers a portion of the fraudulent benefits

that are obtained from the tax returns; in yet other instances, the tax returns or claims are from people who believe they may be entitled to benefits but do not know that the schemers are reporting false information to the IRS to fraudulently increase the amount of the benefits claimed and or received.

b.    Using computer, cellphones, and other digital devices, the schemers submit false tax returns to the IRS and using a static IP address associated to a residential or commercially available internet service provider.

c.    Using banks accounts controlled by the schemers, the schemers then list bank account numbers they control on the false tax returns.

d.    Using mailing and physical addresses that the schemers control, the schemers list these addresses on fake tax returns so that any checks, payments, and other correspondence will be mailed to the address and thus intercepted by the schemers.

e.    Finally, the schemers usually withdraw the fraudulently-obtained economic stimulus payments through ATM withdrawals from the bank accounts they control, which they listed on the false tax returns.

94.  Based on my training and experience, conversations with other law enforcement officers, and familiarity with investigations into drug trafficking, I know that individuals involved in drug trafficking generally follow recognizable patterns, including the following, among others:

a.    Drug traffickers commit crimes that involve numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers and fraudsters often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct criminal transactions, and transport drugs or proceeds obtained from fraudulent activity.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records related to the manufacturing, transportation, ordering, sale and distribution of illegal drugs or proceeds obtained from illegal activity. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as in their residences, businesses, and vehicles, and on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking and fraud to have photos and videos on their cell phones of drugs or others working with them, as they frequently send these

41

photos to each other and others to boast about their illicit activities.

d.    Drug traffickers, like fraudsters, often keep the names, addresses, and telephone numbers of their associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices, including rotating the usage of telephone numbers to avoid law enforcement detection.  Narcotics traffickers often require the use of one or more digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

95.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residences, vehicles, and stash houses, or in places that are readily accessible, and under their physical control, such as in their digital devices.  It has been my experience that prohibited

individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

       b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[17]

96.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[17] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

　　　　c.　The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

　　　　d.　Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

　　97.　Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

98.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

46

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KIM's and FOSTER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of KIM's and FOSTER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

99. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## VIII.     <u>CONCLUSION</u>

100. For all of the reasons described above, there is probable cause that KIM committed a violation of 21 U.S.C. § 841(b)(1)(B)(viii): Possession with Intent to Distribute Methamphetamine.  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES 1 through 4, as described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
March, 2021.

THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE